1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  KAREN KEIFER,
                                   NO. CIV. S-04-2077 LKK/DAD
12
            Plaintiff,
13
        v.                                    O R D E R
14
    HAMILTON ENGINE SALES, INC.;
15  DOUG ANDERSON; CRAIG LOWART;
    and JOHN McGREW,
16
            Defendants.
17  _____/

18          Plaintiff, Karen Keifer, brings suit against her former

19  employer, Hamilton Engine Sales, Inc. and former supervisor, Doug

20  Anderson ("defendants") for employment discrimination.  Plaintiff

21  asserts claims for (1) sexual harassment; (2) retaliation in

22  violation of the California Fair Employment and Housing Act

23  ("FEHA"); (3) age discrimination; and (4) wrongful termination in

24  violation of public policy.  On October 1, 2004, defendants removed

25  the action to this Court on the basis of diversity jurisdiction.

26  ////

1

1    Pending before the court is defendants' motion for summary

2  judgment.   Defendants move for summary judgment on all claims

3  raised in plaintiff's complaint.[1]   Plaintiff does not oppose

4  summary judgment on the sexual harassment claims, the age

5  discrimination claim, or the wrongful termination claim against

6  defendant Anderson. Pl.'s Opp'n at 1:2-8. The court therefor limits

7  its review to the claims for retaliation and wrongful termination

8  as to defendant Hamilton Engine Services, and the claim for

9  retaliation against defendant Anderson.

10                          **I.**

11                        **FACTS**[2]

12  **A.    Hamilton Engine & Plaintiff's Employment**

13    Hamilton Engine sells and services a wide variety of engine

14  parts for the agricultural, construction, marine, timber, and

15  industrial markets. Defs.' SUF 1.   The Company is headquartered

16  in Portland, Oregon, and employs approximately 16 workers.  Defs.'

17  SUF 2. Hamilton Engine owned and operated a branch office with

18  approximately seven employees in West Sacramento, California, where

19  plaintiff worked.   Defs.' SUF 3.   Doug Anderson is the Vice

20  President of Hamilton, and is based in the Portland office. Defs.'

21  SUF 4.

22    Plaintiff was hired as an administrative assistant to work in

23  ─────────────────

24    [1]    On September 15, 2004, plaintiff dismissed defendants
Craig Lowart and John McGrew from the case with prejudice.

25    [2] Undisputed unless otherwise noted.

26

2

1  Hamilton's West Sacramento branch on July 17, 1995. Defs.' SUF 10.

2  At the times at issue, Craig Lowart was the General Manager of the

3  West Sacramento Branch. Defs.' SUF 11. Plaintiff was a clerk and

4  not a manager or a supervisor. Defs.' SUF 12. Plaintiff's

5  employment with defendants terminated on June 10, 2003.

6  **B.   Plaintiff's Job Duties**

7       The parties have different understandings of plaintiff's job

8  duties. Plaintiff maintains that her job duties included "release

9  orders, handled customer credits, handled warranties, did branch

10 expenses, answered the telephones, handled customer complaints,

11 kept filed on customers, accurately recorded time cards and sent

12 time sheets to the Portland office." Karen Keifer Declaration ¶

13 5 ("Keifer Decl."). Plaintiff stated in her declaration that,

14            In fulfilling my duties in reference to time cards, my
            responsibility was to make sure the time cards were
15          accurately filled out by employees, and, if not, I would make
            corrections to those time cards. For example, if an employee
16          failed to clock out for lunch, I would determine whether or
            not lunch was in fact taken and, if so, change the time card
17          to reflect that. I would enter the corrected time cards into
            the spreadsheet, which I then sent to the corporate office in
18          Portland.

19 Id. ¶ 8.

20      Defendants, however, dispute plaintiff's job responsibilities

21 with respect to the time sheets. According to defendants,

22 plaintiff was responsible for entering information from time sheets

23 into a spreadsheet which was submitted to the corporate office in

24 Portland. Plaintiff did not have the authority to alter the time

25 records of employees under any circumstances. If plaintiff noticed

26 any inaccuracies on a time card, she was to bring it to the

3

1 attention of the manager, Craig Lowart.   Defs.' SUF 14-17.

2 **C.   Plaintiff's August 28, 2003 Letter to Anderson**

3     On August 28, 2003 plaintiff wrote defendant Anderson.   She

4 claimed that a male employee, Bo Blakely, sexually harassed her.

5 Plaintiff stated that Blakely had said he wanted to "spank her butt

6 to feel how really hard it was", that he wanted "to do" her

7 daughter.   The letter went on to state that each time plaintiff

8 approached Lowart about the problem, she was told by Lowart to not

9 call Anderson and that "out [sic] problems will be handled down

10 here."   She went on to state that problems are never handled and

11 "I am always made out to look like a troublemaker."   Keifer Decl.,

12 Ex. 3.

13     The allegations contained in the August 28 letter were

14 investigated and Anderson found that Blakely had acted

15 inappropriately.   Blakely was subsequently terminated.   Anderson

16 Decl. ¶ 7.

17 **D.   Plaintiff's Relationship with Craig Lowart**

18     In her declaration, plaintiff indicates that she felt that

19 Craig Lowart, the manager, was not responding to the needs of

20 employees.   He failed to handle problems and stated on several

21 occasions that plaintiff should not "call corporate about

22 problems."   Keifer Decl. ¶ 35.   Plaintiff also stated that Lowart

23 had approached her two or three months after the August 28 letter

24 to Anderson and "informed me, with a smirk on his face, that Doug

25 Anderson was not happy with me and was probably going to fire me."

26 Id. ¶ 38.

4

**E.    The Jinks Time Card & The Events Leading to Plaintiff's Termination**

As discussed previously, plaintiff believed that one of her job responsibilities was to "make sure that the time cards were accurately filled out by employees, and if not, I would make corrections to those time cards." Keifer Decl. ¶ 8.   Plaintiff believed that "intentionally claiming hours not worked or failing to properly record lunches taken was a violation of the company's policy and California labor law." Id. ¶ 11.  Plaintiff believed that California Labor Code Section 512 required employees to take lunch periods on a daily basis.

About one year prior to plaintiff's departure from the company, she became aware that Corky Jinks, a fellow employee, was regularly taking lunch breaks without punching out on his time card.  Plaintiff "regularly informed" her manager, Lowart, "of the false time cards submitted by Jinks.  Lowart would either make the correction to the time card to correctly reflect hours worked or would instruct me to make the changes." Keifer Decl. ¶ 14.  Lowart specifically "instructed me that if I knew for a fact that Jinks had taken a lunch but had not recorded it on his time card, I was to make that change to the time card." Id. ¶ 15; see, also, Keifer Depo. 151:12-25; 154:5-15.

Plaintiff asserts that Lowart failed to take any action and continually ignored her concerns.  Plaintiff thereafter contacted Hamilton's Controller, Philip DiFabio, about the "false time cards being submitted by Jinks." Keifer Decl. ¶ 18.  DiFabio, who was

located in the Portland office, told plaintiff that if she "knew
for a fact that Corky refused to clock out for lunch and that he
was taking a lunch, that I was to write it in."  Keifer Depo. at
152:16-21.  DiFabio then checked with Anderson and Anderson told
plaintiff that "it was being handled."  Id. at 153:1-2.

In May of 2003, Lowart told plaintiff that "company employees
had never clocked out for lunch."  Plaintiff told Lowart that she
thought he was wrong and showed him records from previous years
when every employee clocked out for lunch.  Lowart did not sign
Jinks' May 2003 time card which plaintiff had altered to reflect
when Jinks took lunch.  Plaintiff submitted the time card anyway.
Id. at 155:8-23.

Plaintiff maintains that although defendants "claim that I was
being fired for altering Jinks' time card for the May 31, 2003
period, I had altered Jinks' time cards on numerous occasions prior
to that date... these changes were not objected to by anyone."
Kiefer Decl. ¶ 19.  Attached to plaintiff's declaration are time
sheets from pay periods prior to May 2003 which plaintiff had
altered.

Defendants present a different version of the facts.
Defendants maintain that the plaintiff's job responsibilities did
not include altering time sheets and that plaintiff knew that
Lowart had the final say on approving time sheets. Defs.'s SUF 47-
48.  Lowart had authorized Jinks' "on-duty meal period because the
branch was short staffed at that time and Jinks was therefor needed
to remain in the office to take sales calls during the lunch

6

period." Defs.' SUF 49. Defendants also point out that plaintiff knew the company policy which forbid employees from altering the time sheets of other employees. In May of 2003, plaintiff approached Lowart again about Jinks' time sheet and Lowart told her to leave Jinks' time card "as it is." Defs.' SUF 53. Nonetheless, plaintiff "changed Jinks time card by subtracting about 5.5 hours of overtime worked during the last pay period in May 2003." Defs.' SUF 54.

On June 5, 2003, Jinks received his paycheck for the last two weeks of May and complained to Lowart that he was short about 5.5 hours of overtime. When questioned about it, plaintiff told Lowart that she had in fact made the changes to Jinks' card but believed she had been given permission by DiFabio to fill in the correct times. Keifer Dep. At 156:14-20.

Anderson, having been appraised of the situation, paid Jinks for his time and apologized. Anderson Decl. ¶ 10. Anderson concluded that plaintiff violated company policy by "altering Jinks' time card." Moreover, "by reducing the number of hours for which Jinks was paid to be below the number of hours Jinks claims to have worked, [plaintiff] exposed the company to liability for failure to pay Jinks the wages to which he was entitled." Id. ¶ 11.

On June 10, 2003, Anderson wrote to plaintiff. He informed plaintiff that she had violated company policy. He also explained that her job performance was "well below expectations" and that she continued to make "the same mistakes day after day, causing delays

7

1  and costing our company significant sums of money." The letter

2  concluded by informing plaintiff that her employment with

3  Hamilton's was terminated and that the termination was effective

4  immediately.  Kiefer Decl., Ex. 9.

5                              **III.**

6         **SUMMARY JUDGMENT STANDARD UNDER FED. R. CIV. P. 56**

7       Summary judgment is appropriate when it is demonstrated that

8  there exists no genuine issue as to any material fact, and that the

9  moving party is entitled to judgment as a matter of law.  Fed. R.

10  Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144,

11  157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th

12  Cir. 1995).

13       Under summary judgment practice, the moving party

14            [A]lways bears the initial responsibility of
             informing the district court of the basis for
15            its motion, and identifying those portions of
             "the pleadings, depositions, answers to
16            interrogatories, and admissions on file,
             together with the affidavits, if any," which
17            it believes demonstrate the absence of a
             genuine issue of material fact.
18
   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the
19
   nonmoving party will bear the burden of proof at trial on a
20
   dispositive issue, a summary judgment motion may properly be made
21
   in reliance solely on the 'pleadings, depositions, answers to
22
   interrogatories, and admissions on file.'"  Id.  Indeed, summary
23
   judgment should be entered, after adequate time for discovery and
24
   upon motion, against a party who fails to make a showing sufficient
25
   to establish the existence of an element essential to that party's
26

                                  8

1  case, and on which that party will bear the burden of proof at

2  trial. See id. at 322. "[A] complete failure of proof concerning

3  an essential element of the nonmoving party's case necessarily

4  renders all other facts immaterial." Id. In such a circumstance,

5  summary judgment should be granted, "so long as whatever is before

6  the district court demonstrates that the standard for entry of

7  summary judgment, as set forth in Rule 56(c), is satisfied." Id.

8  at 323.

9       If the moving party meets its initial responsibility, the

10  burden then shifts to the opposing party to establish that a

11  genuine issue as to any material fact actually does exist.

12  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

13  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

14  391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

15       In attempting to establish the existence of this factual

16  dispute, the opposing party may not rely upon the denials of its

17  pleadings, but is required to tender evidence of specific facts in

18  the form of affidavits, and/or admissible discovery material, in

19  support of its contention that the dispute exists. Fed. R. Civ.

20  P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l

21  Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

22  1998). The opposing party must demonstrate that the fact in

23  contention is material, i.e., a fact that might affect the outcome

24  of the suit under the governing law, Anderson v. Liberty Lobby,

25  Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of

26  Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)

9

1   (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,

2   809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,

3   i.e., the evidence is such that a reasonable jury could return a

4   verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see

5   also Cline v. Industrial Maintenance Engineering & Contracting Co.,

6   200 F.3d 1223, 1228 (9th Cir. 1999).

7       In the endeavor to establish the existence of a factual

8   dispute, the opposing party need not establish a material issue of

9   fact conclusively in its favor.  It is sufficient that "the claimed

10  factual dispute be shown to require a jury or judge to resolve the

11  parties' differing versions of the truth at trial."  First Nat'l

12  Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.

13  Thus, the "purpose of summary judgment is to 'pierce the pleadings

14  and to assess the proof in order to see whether there is a genuine

15  need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

16  Civ. P. 56(e) advisory committee's note on 1963 amendments); see

17  also International Union of Bricklayers & Allied Craftsman Local

18  Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.

19  1985).

20      In resolving the summary judgment motion, the court examines

21  the pleadings, depositions, answers to interrogatories, and

22  admissions on file, together with the affidavits, if any.  Rule

23  56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

24  (9th Cir. 1999).  The evidence of the opposing party is to be

25  believed, see Anderson, 477 U.S. at 255, and all reasonable

26  inferences that may be drawn from the facts placed before the court

10

must be drawn in favor of the opposing party, see Matsushita, 475

U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

655 (1962) (per curiam)); See also Headwaters Forest Defense v.

County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000).

Nevertheless, inferences are not drawn out of the air, and it is

the opposing party's obligation to produce a factual predicate from

which the inference may be drawn.  See Richards v. Nielsen Freight

Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d

898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party

"must do more than simply show that there is some metaphysical

doubt as to the material facts. . . . Where the record taken as a

whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'"

Matsushita, 475 U.S. at 587 (citation omitted).

**IV.**

**ANALYSIS**

**A.   Retaliation Claim against Defendant Hamilton and Defendant Anderson**

Plaintiff claims that defendants' actions towards her

constituted unlawful retaliation in violation of the provisions of

the California Fair Employment and Housing Act ("FEHA"), section

12940(h), which forbids employers from retaliating against

////

////

1   employees who have acted to protect the rights afforded by FEHA.[3]

2   Specifically, plaintiff claims she was retaliated against for her

3   August 28, 2002 letter in which she alleged that she had been the

4   victim of sexual harassment.

5       Lawsuits claiming retaliatory employment termination in

6   violation of FEHA are analogous to federal Title VII claims, and

7   are evaluated under federal law interpreting Title VII cases. Flait

8   v. North American Watch Corp., 3 Cal. App. 4th 467, 475-476 (Cal.

9   App. 2 Dist. 1992).

10      The elements of Title VII and FEHA claims require that (1)

11  plaintiff establish a prima facie case of retaliation, (2)

12  defendant articulate a legitimate nonretaliatory explanation for

13  its acts, and (3) plaintiff show that the defendant's proffered

14  explanation is merely a pretext for the illegal termination.

15  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005)

16  (citations omitted).

17      For the reasons discussed herein, plaintiff fails to establish

18  one of the key elements required for the showing of a prima facie

19  case.

20      **1.   Prima Facie Case**

21      To establish a prima facie case of retaliation under FEHA, a

22  plaintiff must show that (1) he or she engaged in a "protected

23  _____

24      [3]    Section 12940(h) makes it an unlawful employment practice
    for an employer "to discharge, expel, or otherwise discriminate
    against any person because the person has opposed any practices
25  forbidden under this part or because the person has filed a
    complaint, testified, or assisted in any proceeding under this
26  part."

1 activity," (2) the employer subjected the employee to an adverse

2 employment action, and (3) a causal link existed between the

3 protected activity and the employer's action.  Yanowitz, 36 Cal.

4 4th at 1042. "[T]he requisite degree of proof necessary to

5 establish a prima facie case for Title VII on summary judgment is

6 minimal and does not even need to rise to the level of a

7 preponderance of the evidence.'" Villiarimo v. Aloha Island Air,

8 Inc., 281 F.3d 1054, 1061-62 (9th Cir. 2002) (citations omitted).

9        Plaintiff asserts that she engaged in protected activity when

10 she wrote to Anderson in August 2002.  In that letter, plaintiff

11 complained of being sexually harassed by a co-worker.  Plaintiff

12 further maintains that she suffered an adverse employment action,

13 i.e., she was fired, and that there is a casual link between her

14 complaint in August of 2002 and her termination of employment in

15 June of 2003.

16       Neither party takes issue with the two of the three elements

17 of the prima facie case, namely, that plaintiff engaged in a

18 protected activity and that she suffered an adverse employment

19 action.  The issue the court must resolve is whether there is a

20 sufficient causal link between the protected activity and the

21 adverse employment action.

22    **a.  Causation**

23       Causation sufficient to establish the third element of the

24 prima facie case may be inferred from circumstantial evidence, such

25 as the employer's knowledge that the plaintiff engaged in protected

26 activities and the proximity in time between the protected action

1  and the allegedly retaliatory employment decision.  Yartzoff v.

2  Thomas,  809 F.2d 1371, 1376 (9th Cir. 1987).

3      Recently, this Circuit has reiterated that a plaintiff must

4  show "by a preponderance of the evidence that engaging in the

5  protected activity was one of the reasons for [her] firing and that

6  but for such activity [she] would not have been fired." Villiarimo,

7  281 F.3d at 1065.

8      In the case at bar,  plaintiff wrote to Anderson in August

9  2002.  She was fired ten months later, in June of 2003. Defendants

10 assert that the time laps is so great that there is insufficient

11 temporal proximity between the protected activity and the adverse

12 employment action.  For the reasons discussed herein, the court

13 agrees.

14     Causation can be inferred from timing alone where an adverse

15 employment action follows on the heels of protected activity.

16 Villiarimo, 281 F.3d 1054, 1065 (9th Cir. 2002).  In Villiarimo,

17 the Circuit held that a six month time laps between the protected

18 activity and an adverse employment action is simply too long to

19 give rise to an inference of causation. The Villiarimo court cited

20 other decisions in which the temporal proximity was insufficient:

21 Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 398-99 (7th

22 Cir. 1999) (four months too long); Adusumilli v. City of Chicago,

23 164 F.3d 353, 363 (7th Cir. 1998) (eight months too long); Davidson

24 v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998) (five

25 months too long); Conner v. Schnuck Markets, Inc., 121 F.3d 1390,

26 1395 (10th Cir. 1997) (four months too long)).  See, also, Manett

14

1   v. Bank of America, 339 F.3d 792, 802 (9th Cir. 2003) ("While

2   courts may infer causation based on the 'proximity in time between

3   the protected action and the allegedly retaliatory employment

4   decision,' such an inference is not possible in this case because

5   approximately nine months lapsed between the date of Manatt's

6   complaint and the Bank's alleged adverse decisions.").

7       There is no bright line rule as to the amount of time required

8   to show temporal proximity in these types of situations.  The Ninth

9   Circuit has cautioned that a "specified time period cannot be a

10  mechanically applied criterion. A rule that any period over a

11  certain time is per se too long (or, conversely, a rule that any

12  period under a certain time is per se short enough) would be

13  unrealistically simplistic." Coszalter v. City of Salem, 320 F.3d

14  968, 977-78 (9th Cir. 2003).   That said, as the Villiarimo court

15  points out, a review of decisions by other courts reveals that as

16  a general matter, an elapse of ten months is simply too attenuated.

17  Villiarimo, 281 F.3d at 1065.

18      Although the requisite degree of proof to establish a prima

19  facie case is minimal, Villiarimo, 281 F.3d at 1061-62, plaintiff

20  simply fails to set forth facts that show the necessary causation

21  between the August 2002 letter and the termination of her

22  employment in June 2003.  Plaintiff engaged in protected activity

23  in August 2003 and was terminated ten months later.  She does not

24  claim to have engaged in any other protected activity in between

25  August of 2002 and June of 2003.

26      Plaintiff, in her opposition, urges the court to consider the

15

1   fact that two to three months after she wrote to Anderson, Craig

2   Lowart informed plaintiff that Doug Anderson was not happy with her

3   and was probably going to fire her.  Pl.'s Opp'n at 8.  In drawing

4   all reasonable inferences in favor of plaintiff, which the court

5   must do, this statement does not compensate for the fact that ten

6   months transpired between the protected activity and the adverse

7   inference.   In other words, even when the court   draws all

8   reasonable inferences in favor of plaintiff and construes the

9   Lowart comment as an extension of plaintiff's protected activity,

10  this comment was made at the very least seven months prior to the

11  time plaintiff was fired.

12      In short, the temporal proximity present in this case is

13  insufficient to establish the causation element of plaintiff's

14  prima facie case. "[T]iming alone will not show causation in all

15  cases; rather, 'in order to support an inference of retaliatory

16  motive, the termination must have occurred fairly soon after the

17  employee's protected expression." ' Villiarimo, 281 F.3d at 1065.

18  Here, even when drawing all reasonable inferences in favor of

19  plaintiff, the termination did not occur "fairly soon" after the

20  protected expression.

21      The court concludes, therefor, that plaintiff has failed to

22  establish one of the three elements necessary to put forth a

23  a prima facie case of retaliation.  As such, summary judgment is

24  GRANTED to defendants on the retaliation claim.

25  **B.    Wrongful Termination in Violation of Public Policy**

26      Defendants also seek summary judgment on plaintiff's claim of

1   wrongful termination in violation of public policy against
2   defendant Hamilton Engine Services.  Plaintiff maintains that her
3   claim of wrongful discharge in violation of public policy "lie
4   under two different scenarios: (1) retaliation based on her
5   complaints of discrimination pursuant to government code section
6   20940 [FEHA]; and (2) [plaintiff's] complaint of illegal conduct
7   in violation of the Labor Code."  Pl.'s Opp'n at 12.

8      Under California law an employer may be held liable for
9   wrongful termination if it discharges an employee in contravention
10   of fundamental public policy. <u>Tameny v. Atlantic Richfield Co.</u>, 27
11   Cal. 3d 167, 177 (1980); <u>Green v. Ralee Engineering Company</u>, 19
12   Cal. 4th 66 (1998).

13      In order to sustain a claim of wrongful discharge in violation
14   of fundamental public policy, plaintiff must prove several
15   elements.  First, the public policy must be supported by either
16   constitutional or statutory provisions.  Second, it must be
17   "public" in the sense that it "inures to the benefit of the public"
18   rather than serving merely the interests of the individual.  Third,
19   the policy must be articulated at the time of discharge.  Fourth,
20   the policy must be "fundamental" and "substantial." <u>Stevenson v.</u>
21   <u>Superior Court</u>, 16 Cal. 4th 880, 889, (1997); <u>see</u> <u>also</u> <u>Green</u>, 19
22   Cal. 4th at 76.

23      A policy is "fundamental" when it is "carefully tethered" to
24   and "delineated in constitutional or statutory provisions," which
25   involves a duty affecting the public at large, rather than one owed
26   to or imposed solely upon the parties to a dispute and is "'well

1  established' " and "sufficiently clear" to the employer at the time

2  of the discharge.  <u>Gantt v. Sentry Insurance</u>, 1 Cal. 4th 1083, 1090

3  (1992) (overruled on other grounds) (citations omitted).

4      Tort claims for wrongful discharge typically arise when an

5  employer retaliates against an employee for "(1) refusing to

6  violate a statute,  (2) performing a statutory obligation, (3)

7  exercising a statutory right or privilege , or (4) reporting an

8  alleged violation of a statute of public importance." <u>Turner v.</u>

9  <u>Anheuser-Busch, Inc.</u>, 7 Cal. 4th 1238, 1256 (1994) (citations

10 omitted).

11     Plaintiff asserts two grounds for the wrongful discharge.  The

12 court addresses each in turn.

13     **1.   Wrongful Discharge Premised on FEHA Violation**

14     Plaintiff's argument here appears to be that she was

15 retaliated against for "exercising a statutory right or privilege"

16 that being, reporting sexual discrimination, a violation under

17 FEHA.   As defendants properly point out in their reply brief,

18 "while a violation of FEHA can support a claim of wrongful

19 termination in violation of public policy, the public policy claim

20 is only as valid as the claim brought directly under FEHA." Defs.'

21 reply at 9.   The court agrees that the public policy claim is

22 derivative of the FEHA claim.

23     For the reasons discussed infra, plaintiff cannot establish

24 a prime facie case of retaliation in violation of FEHA.  Therefor,

25 she cannot similarly establish a violation of a public policy as

26 articulated through FEHA.   In other words, to the extent that

                                   18

1  plaintiff cannot show a prima facie case under FEHA, she cannot

2  show that she was wrongly terminated on the grounds of a violation

3  of public policy premised on FEHA.   See e.g., Sanders v. Arneson

4  Products, Inc., 91 F.3d 1351 (9th Cir. 1996) (Under California law,

5  former employee's state law claim for tortious discharge in

6  violation of public policy could not be maintained, where employee

7  failed to show that employer violated ADA); Jennings v. Marralle,

8  8 Cal. 4th 121, 135-136 (1994) (no public policy claim against

9  employers who have not violated the law).

10          **2.   Wrongful Discharge Premised on Reporting Time Card**
                **Discrepancies**

11

12      Plaintiff's alternative theory is that she was wrongfully

13  discharged in violation of public policy for having complained of

14  illegal conduct in violation of the Labor Code.   Specifically,

15  plaintiff bases her allegations on Labor Code Section 512,

16  which provides pertinent part that:

17          An employer may not employ an employee for a work period of
            more than five hours per day without providing the employee
18          with a meal period of not less than 30 minutes, except that
            if the total work period per day of the employee is no more
19          than six hours, the meal period may be waived by mutual
            consent of both the employer and employee.
20
            Cal. Labor Code, § 512.
21
        Plaintiff appears to argue that she was fired for reporting
22
    violations of the Labor Code to her supervisors and that reporting
23
    these violations is important because "the Labor Code provisions
24
    regarding wage and hours involves a strong public policy."   Pl.'s
25
    Opp'n at 12.   Defendants maintain that plaintiff's claim cannot
26

19

1  be sustained.   For the following reasons, the court agrees.

2       In her declaration submitted in support of her opposition to

3  the motion for summary judgment, plaintiff explains that she

4  believed that "claiming hours not worked or failing to properly

5  record lunches taken was a violation of the company's policy and

6  California labor law." Keifer Decl. ¶ 11. Plaintiff observed Corky

7  Jinks "falsify his time sheet by claiming that he worked during

8  lunch, even when I was personally aware that he had not worked

9  during his lunch break."  Id. ¶ 12.  She thereafter reported what

10  she believed to be violations of the Labor Code Section 512 to her

11  supervisors.   Under this theory, plaintiff has not established a

12  triable issue of fact that defendants terminated her in

13  contravention of public policy.

14       As noted above, to maintain a cause of action for wrongful

15  termination on this basis, plaintiff is required to establish that

16  her report (of an alleged statutory violation) involved a

17  significant public interest.   A claim of wrongful discharge in

18  violation of public policy cannot be based on private interests

19  that do not directly impact the public. See Turner v.

20  Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1256-57 (1994) (discharge

21  for exposing violations of internal operating practices and a

22  collective bargaining agreement did not contravene public policy).

23  In order to prevail on this claim, plaintiff must establish that

24  the basis of her termination contravened a fundamental public

25  policy that "inures to the public at large rather than to a

26  particular employer or employee." Rojo v. Kliger, 52 Cal. 3d 65,

1    91 (1990).

2        In the case at bar, plaintiff's complaints to management about

3    the violation of the labor code serves the private interests of

4    defendants but not the interests of the public at large.   By

5    plaintiff's own statements, she reported the Jinks time card issue

6    to management not because her reporting of it furthered the purpose

7    of the labor code, but because she was concerned that defendants

8    were overpaying Jinks.   See Keifer Decl. ¶ 11-14.

9        This case presents facts similar to those at issue in American

10   Computer v. Superior Court.   There, an employee who reported

11   suspicions of embezzlement to his employer and was subsequently

12   discharged did not have a cause of action for wrongful termination.

13   213 Cal. App. 3d 664 (Cal. App. 4 Dist. 1989). The court determined

14   that while plaintiff's report might benefit the public by

15   preventing or uncovering the commission of a felony and "thereby

16   serve the laudable goal of preventing crime," this public benefit

17   was not "weighty enough to give rise to a claim for wrongful

18   discharge." Id. at 668.

19       Similarly, in Foley v. Interactive Data Corp., the California

20   Supreme Court held that an employer's discharge of an employee,

21   after he reported to his employer that his new supervisor was under

22   suspicion for embezzlement at another company, was insufficient to

23   support a claim for wrongful termination. 47 Cal. 3d 654, 662

24   (1988). The court explained that, "when the duty of an employee to

25   disclose information to his employer serves only the private

26   interest of the employer, the rationale underlying the Tameny cause

21

1   of action is not implicated." <u>Foley</u>, 47 Cal. 3d at 671; <u>see also</u>

2   <u>Turner</u>, 7 Cal. 4th at 1256-57 (1994) (discharge for exposing

3   violations of internal operating practices and a collective

4   bargaining agreement did not contravene public policy).

5       The case law is clear that the report of alleged rule breaking

6   by an employee to an employer must be of the type that goes beyond

7   merely protecting the employer's interest; the report must also

8   implicate some broader public interest.   Here, plaintiff has

9   failed to tender any evidence to suggest that her reporting of the

10  labor code violations implicated a broader public interest.[4]

11  Plaintiff reporting to her supervisor that Jinks was not recording

12  the time he took for lunch on his time sheet was, at most,

13  benefitting her employer and certainly did not rise to the level

14  of serving the interests of the public.    In this case, as in

15  <u>Foley</u>, <u>American Computer</u>, and <u>Turner</u>, plaintiff's reports may have

16  uncovered wrongful conduct. However, the benefit that might inure

17  to the public as a result of reporting that Jinks did not account

18  for his lunch breaks is simply too attenuated to support

19  plaintiff's claim for wrongful termination in violation of public

20  policy.

21  _____

22      [4] Interestingly, defendants dispute the extent it was even in
    their interest to have plaintiff report these alleged Labor Code
23  violations.    Yet, this dispute is, for the purposes of this
    motion, immaterial.  Under the facts alleged by the parties, at the
    very least, plaintiff's reporting of the Jinks time card benefitted
24  no one (defendants' contention). At most, plaintiff's reporting of
    the Jinks time card violations benefitted her employer (plaintiff's
25  contention).    Under none of the versions of facts presented, can
    it be argued that plaintiff's reporting of the time card issue
26  benefitted the public at large.

1    In short, plaintiff fails to establish the existence of a

2 factual dispute which would preclude summary judgment as to this

3 claim.  Therefor, the court finds that defendants are entitled to

4 summary judgment as to plaintiff's claim for wrongful discharge in

5 violation of public policy.

6                                    **V.**

7                               **CONCLUSION**

8    Defendant's motion for summary judgment is GRANTED.

9 IT IS SO ORDERED.

10 DATED: September 13, 2006.

11

12

13                          _____
                            LAWRENCE K. KARLTON
14                          SENIOR JUDGE
                            UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26